UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                  )
UNITED STATES OF AMERICA          )
                                  )
v.                                )     Criminal Action
                                  )     No. 13-10332-PBS
                                  )
SIHAI CHENG,                      )
a/k/a CHUN HAI CHENG,             )
a/k/a ALEX CHENG,                 )
                                  )
             Defendant.           )
_____ )
```

### SENTENCING MEMORANDUM

February 1, 2016

Saris, C.J.

### INTRODUCTION

Sihai Cheng pled guilty to six counts of a ten-count indictment, including: Count 1, conspiracy to commit export violations, in violation of 50 U.S.C. § 1705; Count 2, conspiracy to violate the Anti-Smuggling Statute, in violation of 18 U.S.C. § 371; and Counts 3 through 6, unlawful export of U.S. goods to Iran, in violation of 50 U.S.C. § 1705. Cheng signed a plea agreement with the government, under which the government agreed to dismiss Counts 7 through 10—smuggling goods, in violation of 18 U.S.C. § 554—following sentencing. In short, Cheng was part of an illicit scheme to export highly sensitive goods with nuclear applications, called pressure transducers, from the United States to Iran through China.

1

Pressure transducers can be used in gas centrifuges to enrich uranium to produce weapons-grade uranium. The International Emergency Economic Powers Act, several executive orders issued thereunder, and the Iranian Transaction Regulations prohibit the export of pressure transducers to Iran. See 50 U.S.C. § 1705; 31 C.F.R. pt. 560; Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005).

The parties and the Probation Office agree that U.S.S.G. § 2M5.1 is the applicable sentencing guideline. The Probation Office determined that the base offense level is 26, and the total offense level is 23, after applying the three-level reduction for acceptance of responsibility under § 3E1.1. Cheng has a criminal history category of I, and the Probation Office calculated a guideline imprisonment range of 46-57 months.

The government objected to the Probation Office's determination that the four-level aggravating role adjustment under U.S.S.G. § 3B1.1(a) does not apply. Although the government argued in its sentencing memorandum that the Court should apply the terrorism enhancement under U.S.S.G. § 3A1.4, the government did not object to the Probation Office's decision not to apply § 3A1.4 in calculating the total offense level in the Presentence Report (PSR). Rule 32(f)(1) of the Federal Rules of Criminal Procedure states: "Within 14 days after receiving the presentence report, the parties must state in writing any

2

objections, including objections to material information,
sentencing guideline ranges, and policy statements contained in
or omitted from the report." Fed. R. Crim. P. 32(f). However,
the Court "may impose sentencing enhancements belatedly
suggested by the Government and not contained in the PSR,
provided the defendant is afforded an adequate opportunity to
respond to the Government's late submission and any revision of
the PSR." United States v. Young, 140 F.3d 453, 457 (2d Cir.
1998); see also United States v. Rolfsema, 468 F.3d 75, 78-79
(1st Cir. 2006).

Here, Cheng was afforded an adequate opportunity to respond
because the government stated its intention to argue for the
terrorism enhancement at the Rule 11 hearing, and defense
counsel stated that he had already discussed the potential
application of the enhancement with his client prior to the Rule
11 hearing. Defense counsel opposed applying the enhancement at
the sentencing hearing, but did not argue that the government's
objection was untimely.

In the alternative, the government contended that the Court
should upwardly depart under Application Note 2 to U.S.S.G.
§ 2M5.1, which states a departure from the guidelines may be
warranted when four factors are "present in an extreme form":
"the degree to which the violation threatened a security
interest of the United States, the volume of commerce involved,

3

the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.1 cmt. n.2.

The Court held an evidentiary hearing at which the government's expert, David Albright, testified. Albright is the founder and President of the Institute for Science and International Security, a non-profit, non-partisan institution that conducts technical, scientific, and policy research on the spread of nuclear weapons and related technology. Albright has published numerous assessments of clandestine nuclear weapons programs in technical and policy journals such as the Bulletin of the Atomic Scientists, Science, Scientific American, Science and Global Security, Washington Quarterly, and Arms Control Today. He has coauthored four books on the spread of nuclear technology, including Peddling Peril: How the Secret Nuclear Trade Arms America's Enemies, published in 2010. After careful consideration, I find that neither the aggravating role adjustment nor the terrorism enhancement apply. However, I find that all four factors in U.S.S.G. § 2M5.1 Application Note 2 are present in an extreme form, and upwardly depart by six levels, for the reasons discussed herein.

## DISCUSSION

## I. Aggravating Role Adjustment: U.S.S.G. § 3B1.1(a)

The government argued that the Court should apply an upward adjustment of four levels for Cheng's aggravating role in the

4

offense under U.S.S.G. § 3B1.1(a). To apply the aggravating role enhancement, a district court must find that (1) the scope of the criminal activity "involved five or more participants or was otherwise extensive," and that (2) "the defendant was an organizer or a leader" of the criminal activity. U.S.S.G. § 3B1.1(a); see also United States v. Arbour, 559 F.3d 50, 53 (1st Cir. 2009); United States v. Tejada-Beltrán, 50 F.3d 105, 111 (1st Cir. 1995). The parties do not dispute that the export scheme involved five or more participants. The defendant admitted in his sentencing memorandum, and stated in online chat messages with his co-conspirator Seyed Abolfazl Shahab Jamili, that the conspiracy involved at least six people in China, Iran, and the United States. Furthermore, the government conceded that Cheng did not serve as a "leader" of the criminal activity. Thus, whether the aggravating role enhancement applies turns on whether the defendant is appropriately classified as an "organizer" under § 3B1.1(a).

U.S.S.G. § 3B1.1 does not define what constitutes an organizer for purposes of the guideline. "One may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity." Tejada- Beltrán, 50 F.3d at 112. The First Circuit has emphasized that a defendant who recruits others into the criminal organization is "the very prototype of an

organizer, serving as a magnet to bring others together and thereby lend feasibility to the commission of the crime." Id. at 111-13.

Here, the government emphasized that Cheng is an organizer because he "recruited Wang Ping to act as his agent and facilitate the illegal acquisition of the pressure transducers from the United States to China." Government's Sentencing Mem., Docket No. 83, at 24. The PSR presented the following, unobjected-to facts. In early 2009, Jamili informed Cheng that an Iranian customer was looking for pressure transducers manufactured by either Edwards Ltd., a company based in the United Kingdom, or MKS Instruments, a U.S. manufacturer. Cheng then reached out to Lily Lee at MKS-Shanghai to inquire about placing orders for pressure transducers. Lily Lee directed Cheng to contact Wang Ping. With the knowledge and agreement of other MKS-Shanghai employees, Wang Ping set up two front companies in China to pose as end-users for Cheng, in order to fraudulently obtain export licenses from the United States. MKS-Shanghai had already devised "a system by which export licenses were obtained in the names of legitimate Chinese companies, sometimes without those companies' knowledge, to hide sales to other companies (like Cheng's Iranian customer, Eyvaz) that did not or could not

similarly obtain export licenses." PSR ¶ 31.[1] Based on these facts, I find that Cheng did not recruit Wang Ping to engage in the criminal activity.

Furthermore, the evidence introduced at the sentencing hearing indicates that Cheng and Jamili were coequals in the criminal scheme to export pressure transducers to Iran. Jamili is a citizen of the Islamic Republic of Iran, who introduced Cheng to their Iranian customer, Eyvaz Technic Manufacturing Company (Eyvaz). Online chats and emails between Jamili and Cheng demonstrate that they conspired together to supply pressure transducers to Eyvaz, they both exercised some level of decision-making authority, and they both played an active role in the scheme. Jamili served as the primary point of contact for Eyvaz, taking orders for the pressure transducers. Jamili then sent these orders to Cheng, who served as a middle-man between Jamili and MKS-Shanghai. Therefore, I find that Cheng does not qualify as an organizer under § 3B1.1(a), and the aggravating role enhancement does not apply.

---

[1] The Court notes that this account of MKS-Shanghai's fraudulent export license scheme is consistent with the facts in United States v. Hu, No. 12-cr-10188 (D. Mass. July 24, 2014). See Government's Sentencing Mem., United States v. Hu, No. 12-cr-10188, Docket No. 84, at 2 ("From approximately 2007 to present, Hu and others who worked for/with MKS-Shanghai . . . caused thousands of pressure transducers worth over $6.5 million to be smuggled from the United States and delivered to unauthorized end-users using fraudulently-obtained export licenses.").

## II.   Terrorism Enhancement: U.S.S.G. § 3A1.4

The next issue is whether the twelve-level terrorism enhancement in U.S.S.G. § 3A1.4 applies to this case. Section 3A1.4(a) states that the Court should "increase by 12 levels" if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). If the enhancement applies, "the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI." U.S.S.G. § 3A1.4(b). Application Note 1 specifies that for the purposes of the guideline, "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." U.S.S.G. § 3A1.4 cmt. n.1. That statute in turn defines a "federal crime of terrorism" as an offense that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and (B) is a violation of any one of a long list of enumerated federal crimes.

Although there are no First Circuit cases that specifically address the terrorism enhancement, several other circuits have analyzed its use in detail. See, e.g., United States v. Awan, 607 F.3d 306, 313-15 (2d Cir. 2010) (collecting cases). Courts that have considered the enhancement distinguish between cases where the underlying offense "involved" a federal crime of terrorism on the one hand, and cases where the underlying

8

offense "was intended to promote" a federal crime of terrorism
on the other. See id. In order to apply the "involved" prong of
U.S.S.G. § 3A1.4, the Court must find (1) that the defendant's
offense "included" one of the enumerated federal crimes in 18
U.S.C. § 2332b(g)(5)(B), and (2) that the defendant's conduct
was "calculated to influence or affect the conduct of government
by intimidation or coercion, or to retaliate against government
conduct." Id. at 314. Under the "intended to promote" prong,
"the defendant himself does not have to commit an offense listed
in § 2332b(g)(5)(B), and the defendant's offense need not itself
be 'calculated' as described in § 2332b(g)(5)(A)." Id.

In United States v. Awan, the Second Circuit held that "a
defendant's offense 'involves' a federal crime of terrorism when
his offense includes such a crime, i.e., the defendant
committed, attempted, or conspired to commit a federal crime of
terrorism as defined in 18 U.S.C. § 2332b(g)(5), or his relevant
conduct includes such a crime." 607 F.3d at 314-15; see also
United States v. Mandhai, 375 F.3d 1243, 1247-48 (11th Cir.
2004); United States v. Graham, 275 F.3d 490, 516 (6th Cir.
2001). In contrast, the "intended to promote" prong "applies
where the defendant's offense is intended to encourage, further,
or bring about a federal crime of terrorism, even though the
defendant's own crime of conviction or relevant conduct may not
include a federal crime of terrorism." Awan, 607 F.3d at 314.

The phrase "intended to promote" means "that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism." Id. at 315. Still, the Court must "identify which enumerated 'federal crime of terrorism' the defendant intended to promote, satisfy the elements of § 2332b(g)(5)(A), and support its conclusions by a preponderance of the evidence with facts from the record." United States v. Fidse, 778 F.3d 477, 481-82 (5th Cir. 2015); United States v. Arnaout, 431 F.3d 994, 1002 (7th Cir. 2005); Graham, 275 F.3d at 517.

Here, the government argued that the Court should apply the terrorism enhancement—even though Cheng was not indicted for and did not plead guilty to any of the enumerated federal crimes in 18 U.S.C. § 2332b(g)(5)(B)—because Cheng's export violations involved or were intended to promote[2] a violation of 18 U.S.C. § 832, which is included in the § 2332b(g)(5)(B) list. Section 832(a) states:

> Whoever, within the United States or subject to the jurisdiction of the United States, willfully participates in or knowingly provides material support or resources (as defined in section 2339A) to a nuclear weapons program or other weapons of mass destruction program of a foreign terrorist power, or attempts or conspires to do so, shall be imprisoned for not more than 20 years.

---

[2] The government focused its arguments primarily on the "intended to promote" prong.

The statute defines "foreign terrorist power" to include "a state sponsor of terrorism designated under section 6(j) of the Export Administration Act of 1979 or section 620A of the Foreign Assistance Act of 1961." 18 U.S.C. § 832(d)(3). The United States designated Iran a "state sponsor of terrorism" under section 6(j) of the Export Administration Act and section 620A of the Foreign Assistance Act in 1984, and it remains so designated today. See State Sponsors of Terrorism, U.S. Department of State, http://www.state.gov/j/ct/list/c14151.htm.

Here, Cheng shipped the pressure transducers to his co-conspirator Jamili and to Eyvaz, an agent and contractor for Kalaye Electric Company (Kalaye). Kalaye is an Iranian government organization, which the U.S. Department of Treasury Office of Foreign Assets Control designated as a Weapons of Mass Destruction (WMD) proliferator in 2007. See Additional Designation of Entities Pursuant to Executive Order 13382, 72 Fed. Reg. 25,835 (May 7, 2007).[3] Kalaye is also listed as a WMD proliferator on GlobalSecurity.org, which describes Kalaye's efforts in support of Iran's nuclear centrifuge program in

---

[3] The U.S. Government designated Eyvaz a WMD proliferator in December 2013, after Cheng was indicted in this case. See Additional Designation of Eyvaz Technic Manufacturing Company, The Exploration and Nuclear Raw Materials Production Company, Maro Sanat Company, Navid Composite Material Company, and Negin Parto Khavar Pursuant to Executive Order 13382, 79 Fed. Reg. 56,845 (Sept. 23, 2014).

11

detail. See Kalaye Electric Company, GlobalSecurity.org,
http://www.globalsecurity.org/wmd/world/iran/tehran-kalaye.htm.
GlobalSecurity.org is a non-governmental website maintained by
John Pike, who worked for the Federation of American Scientists
for roughly twenty years before founding GlobalSecurity.org in
December 2000.

The government cited to chats between Cheng and Jamili that
demonstrate Cheng knew (1) that Kalaye was the end-user of the
pressure transducers he shipped to Eyvaz, and (2) that Kalaye
was a WMD proliferator. Jamili told Cheng that Kalaye was the
end-user directly, and instructed Cheng to conduct a "google"
search for "Kalaye Electric Company." In response, Cheng told
Jamili that he quickly found results, and sent Jamili the link
to the Kalaye Electric Company webpage on GlobalSecurity.org.
The chats further indicate that Cheng predicted the imminent
outbreak of "World War III" between the United States and Iran
to Jamili, and was concerned about the impact war would have on
their illegal export business. Government's Sentencing Mem.,
Docket No. 83, at 5. Cheng also expressed a desire to "fuck
USA." Id. at 20. The government did not put forth any evidence
indicating that Cheng knew that the United States had designated
Iran as a state sponsor of terrorism, or that Cheng himself
engaged in any terrorist activities.

The government did not address whether Cheng's, Eyvaz's, or Kalaye's actions were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," as required by the definition of a federal crime of terrorism in 18 U.S.C. § 2332b(g)(5).[4] One could argue that Iran's efforts to develop a nuclear weapons program, during at least some of the time when Cheng was exporting pressure transducers to Iran,[5] were inherently calculated to influence the conduct of other governments around the world. Furthermore, Cheng intended to promote these efforts by supplying Kalaye with critical parts for the uranium enrichment process. That said, the involvement of a state actor in the present case, as opposed to a terrorist group, and the nonviolent nature of Cheng's conduct, make this case distinct from those that have applied the terrorism enhancement. See, e.g., United States v. Stafford, 782 F.3d 786, 791-92 (6th Cir. 2015) (affirming application of the enhancement where defendant "targeted government infrastructure" by conspiring with four other civilians to bomb a bridge near

---

[4] The government did not mention this requirement in its sentencing memorandum.

[5] The government's expert, David Albright, testified at the sentencing hearing that the International Atomic Energy Agency has concluded that Iran had a nuclear weapons program until at least 2009. Cheng exported 1,185 pressure transducers from the United States to Iran between 2009 and 2011.

Cleveland); Mandhai, 375 F.3d at 1247-48 (holding the terrorism
enhancement applied where the defendant's "goal was to bomb and
disable public utilities in the hopes that power outages would
lead to civil strife and upheaval on the streets of Miami");
Graham, 275 F.3d at 516-18 (affirming application of terrorism
enhancement to a "member of a local militia organization which
was planning to attack government targets on an unspecified
future date"). There is no evidence that Cheng, Eyvaz, or Kalaye
had any intention to attack government infrastructure or targets
in the foreseeable future.

As the government acknowledges, there are no cases charging
a defendant with a violation of 18 U.S.C. § 832, and no cases
applying the § 3A1.4 terrorism enhancement where the underlying
offense involves export violations, as in the present case. This
is understandable since U.S.S.G. § 2M5.1 already includes a
twelve-level increase to the base offense level from 14 to 26 if
"(A) national security controls or controls relating to the
proliferation of nuclear, biological, or chemical weapons or
materials were evaded; or (B) the offense involved a financial
transaction with a country supporting international terrorism."
U.S.S.G. § 2M5.1. The defendant, the Probation Office, and the
government all agree that Cheng evaded "national security

14

controls" under § 2M5.1, and that his base offense level is 26.[6]
Thus, his base offense level already takes into account the
national security concerns surrounding his offenses, at least to
some extent.

I find that the § 3A1.4 terrorism enhancement does not
apply because there is not enough evidence that the offenses
were "calculated to influence or affect the conduct of
government by intimidation or coercion, or to retaliate against
government conduct," within the meaning of 18 U.S.C.
§ 2332b(g)(5)(A). Even if § 3A1.4 applied, I would have
downwardly departed or varied. With the twelve-level increase,
Cheng's total offense level would have been 35. With the
mandatory increase in his criminal history category to Category
VI, the guideline range would have been 292-365 months. Despite
arguing for the terrorism enhancement, the government conceded
that the resulting guideline range would have been excessive
because Cheng's offenses "did not include any crimes of violence
and were primarily motivated by greed." Government's Sentencing
Mem., Docket No. 83, at 29. The government instead argued for a
sentence of fifteen years.

---

[6] Case law interpreting U.S.S.G. § 2M5.1 supports applying the
twelve-level increase incorporated into § 2M5.1 in this case.
See United States v. Elashyi, 554 F.3d 480, 508 (5th Cir. 2008)
(holding that export regulations targeted at state sponsors of
terrorism are "national security controls" under § 2M5.1(a));
United States v. McKeeve, 131 F.3d 1, 14 (1st Cir. 1997) (same).

### III.  Upward Departure under U.S.S.G. § 2M5.1 Application Note 2

Application Note 2 to U.S.S.G. § 2M5.1 is a better fit than the § 3A1.4 terrorism enhancement in this case. Section 2M5.1 states that a departure from the guideline range may be warranted where the following factors are "present in an extreme form": "the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.1 cmt. n.2. Here, all four factors squarely apply to an extreme degree.

Cheng's offenses threatened a security interest of the United States because he exported pressure transducers to Eyvaz, knowing that they would be used in Kalaye's uranium enrichment process to support Iran's development of a nuclear weapons program. The volume of commerce involved in the illicit export scheme was extensive: between 2009 and 2011, Cheng arranged for the export of 1,185 MKS pressure transducers. The scheme was highly sophisticated in that it crossed national borders and involved more than five people in three different countries. Early on in the scheme, Wang Ping and Cheng agreed that they would remove the serial numbers from the MKS pressure transducers in order to help avoid detection. Jamili and Cheng also devised two different code words to avoid saying "pressure transducers" in their online chats and emails. Finally, there

16

were multiple occurrences. Cheng exported eleven different
shipments of pressure transducers, each containing between 30
and 300 transducers, over a span of two years.

## CONCLUSION

Based on the presence of all four factors enumerated in
U.S.S.G. § 2M5.1 Application Note 2, I find that an upward
departure of six levels is warranted. The appropriate total
offense level is 29. Given that Cheng has a criminal history
category of I, the guideline range is 87-108 months.[7] The Court
imposes a sentence of nine years imprisonment on Counts 1
through 6, to be served concurrently.


/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge

---

[7] This sentence is consistent with a recent case in the District
of Connecticut, United States v. Mozaffar Khazaee, No. 14-cr-
00009 (D. Conn.). In Mozaffar Khazaee, the court sentenced
Khazaee to 97 months imprisonment for "illegally exporting, and
attempting to illegally export, documents containing technical
data regarding the U.S. Air Force's F35 Joint Strike Fighter
Program, controlled on the U.S. Munitions List, to Iran."
Government's Sentencing Mem., Docket No. 83, at 29-30. The court
upwardly departed "based upon the volume of the material the
defendant attempted to illegally export to Iran, the sensitive
nature of the items the defendant attempted to export to Iran,
and the duration of the defendant's criminal conduct." Id. at
30. A similar upward departure is warranted here.

17