# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                                    )         Criminal Action
          v.                        )         No. 13-10332-PBS
                                    )
SIHAI CHENG,                        )
                                    )
                    Defendant.      )
_____)
```

## MEMORANDUM AND ORDER

July 18, 2019

Saris, C.J.

Sihai Cheng has moved under 28 U.S.C. § 2255 to vacate the nine-year term of imprisonment imposed after he pleaded guilty to six counts of a ten-count indictment relating to his illicit scheme to export pressure transducers, highly sensitive goods with nuclear applications, from the United States to Iran through China. After review of the briefing and the record, the Court **ALLOWS IN PART** and **DENIES IN PART** Cheng's motion to amend (Docket No. 185) and **DENIES** Cheng's motion to vacate his sentence (Docket No. 146).

## FACTUAL AND PROCEDURAL BACKGROUND

Cheng is a citizen of the People's Republic of China. On November 21, 2013, he and three co-conspirators (an Iranian national named Seyed Abolfazl Shahab Jamili; Nicaro Engineering

Co., Jamili's Iranian company; and an Iranian company called Eyvaz Technic Manufacturing Company) were charged in a ten-count indictment with the illegal export of pressure transducers manufactured by MKS Instruments, Inc., a Massachusetts corporation, from the United States to Iran between 2009 and 2012. MKS pressure transducers can be used in gas centrifuges to produce weapons-grade uranium. The indictment charged Cheng with conspiracy to commit export violations in violation of 50 U.S.C. § 1705 (Count I), conspiracy to commit smuggling violations under 18 U.S.C. § 554(a) in violation of 18 U.S.C. § 371 (Count II), unlawful exports of U.S. goods to Iran on four occasions between April and August 2009 in violation of 50 U.S.C. § 1705 (Counts III-VI), and smuggling of U.S. goods to Iran on the same four occasions in violation of 18 U.S.C. § 554 (Counts VII-X).

Cheng served as the middleman in the scheme: He coordinated shipments from the United States, received them in China, and then sent them to Iran. He knew Kalaye Electronic Company, which the United States had designated as a nuclear weapons proliferator, was the end user of the pressure transducers. He also knew exporting the transducers from the United States to Iran was illegal, so he removed their serial numbers to hide their origin. He and his co-conspirators lied about the end users to secure export licenses to ship the goods to China.

After Cheng's arrest in the United Kingdom and his
extradition to the United States, the Court held an initial
status conference on June 9, 2015. The Court asked the Government
to provide a memorandum addressing whether it had
extraterritorial jurisdiction to convict Cheng for conduct in
China. The Government informed the Court that Cheng could be
prosecuted in a U.S. court pursuant to the First Circuit's
decision in United States v. McKeeve, 131 F.3d 1 (1st Cir. 1997),
because his conspiracy involved pressure transducers exported
from Massachusetts. Cheng's attorney, Stephen Weymouth, did not
respond to the Government's memorandum.

On December 18, 2015, Cheng pleaded guilty to Counts I
through VI of the indictment. At the Rule 11 hearing, Cheng said
he was satisfied with Weymouth's representation and Weymouth had
not pressured him into pleading guilty. Besides explaining that
he stopped selling pressure transducers in 2011, not 2012 as
stated in the indictment, he agreed with the factual basis for
the charges as just described. He specifically admitted he knew
exporting the pressure transducers was illegal under U.S. law.
Because of the nature of the crime, the Court recognized that
evidence about Iran's nuclear program would be a significant
issue at sentencing in determining whether a terrorism
enhancement or upward departure was appropriate.

Cheng also stated during the colloquy that he suffered from "mania." Dkt. No. 76 at 7:11-15. Weymouth explained that he had reviewed Cheng's Chinese psychiatric records, which called him "manic" with "racing thoughts" and an "inability to sleep." Id. at 8:2-13. The Court suggested Weymouth submit the records at the sentencing hearing to support an argument for diminished capacity or a variance based on his mental health. The Court authorized money to interpret the records for this purpose.

The Pre-Sentence Report ("PSR") discussed Cheng's mental health at length. He was hospitalized twice in China, once in 1999 and again in 2012. During his 1999 hospitalization, he was diagnosed with mania and prescribed medication.[1] He took the medication until 2003 but stopped due to negative side effects. In addition to his mania, he began having delusions of grandeur in 1999 and experienced suicidal thoughts in the early 2000s and in 2012. Cheng reported that his condition improved significantly after his 2012 hospitalization. Nevertheless, after his arrest, he experienced racing thoughts, vivid dreams and lack of sleep due to "noise" in his brain. While in custody at Wyatt Detention Facility, he had monthly mental health counseling sessions and took melatonin to aid in sleeping. Documentation from Wyatt

---

[1] According to Cheng's affidavit and translated medical records, these medications included clozapine and lithium carbonate.

suggested a diagnosis of "a mood disorder and possible bipolar disorder." PSR ¶ 91.

On January 27, 2016, the Court held an all-day sentencing hearing. The Government called David Albright, the president of a nongovernmental organization that conducts research on nuclear nonproliferation, to testify in support of a terrorism enhancement and upward departure under Application Note 2 to U.S.S.G. § 2M5.1 (evasion of export controls). Albright worked in the field since 1981, wrote hundreds of peer-reviewed articles and five books, and personally studied Iran's nuclear program for over twenty years. His organization conducted significant research on Iran's nuclear program and was the first to identify the Natanz Fuel Enrichment Plant as a gas centrifuge facility.

Albright testified that Iran began to develop a program to create weapons-grade uranium in 1985. It used gas centrifuges located at Natanz and the Fordow Fuel Enrichment Plant to conduct enrichment. Kalaye Electric Company operated the Fordow plant and acquired equipment and materials overseas to develop and design gas centrifuges. Fordow was used for enrichment at least until it was discovered in September 2009, after Cheng made four shipments of pressure transducers to Iran.

Having studied illegal procurement networks, Albright called Cheng's role in the conspiracy "critical" and the scheme "very sophisticated." Dkt. No. 104 at 39:23-40:5, 44:22-45:6. Finally,

he opined that Cheng's conduct put the United States at a strategic disadvantage during negotiations with Iran over its nuclear program: Cheng was supplying Iran with tools to manufacture more centrifuges just as the United States was trying to get Iran to agree to reduce the number of centrifuges.

Weymouth cross-examined Albright about his qualifications, the basis of his opinions, and the timing of Iran nuclear program. Albright admitted he was a mathematician and physicist by education and his opinion relied only on publicly available documents and statements from others. Weymouth emphasized Albright's testimony that he could only say that the weapons-grade enrichment at Fordow continued until 2009, and he pointed out that, according to assessments of Iran's nuclear program from 2009 to 2013, Iran had never made enough weapon-grade uranium for even one nuclear weapon. Albright also admitted that pressure transducers have nonnuclear and nonmilitary purposes. Weymouth did not put on an expert witness to counter Albright's testimony, but he said he had spent dozens of hours over four weeks preparing for the cross-examination.

The Court next heard argument on calculation of the guidelines range. The Government sought, and Weymouth opposed, a four-level aggravating role adjustment as an organizer under U.S.S.G. § 3B1.1(a), a terrorism enhancement under U.S.S.G. § 3A1.4, and an upward departure under Application Note 2 to

U.S.S.G. § 2M5.1. Although Weymouth sought a minor-role adjustment in his sentencing memorandum, he conceded at the hearing that it did not apply. The Court rejected the aggravating role adjustment and terrorism enhancement, which the Government never properly sought, but decided to upwardly depart by six levels under Application Note 2 to U.S.S.G. § 2M5.1 because Cheng's scheme posed a serious threat to national security, involved a substantial volume of commerce and number of occurrences, and was highly sophisticated. With the upward departure, the Court found a total offense level of 29. Cheng had a criminal history category of I, so his guidelines range was 87 to 108 months.

The Court then heard argument on the appropriate sentence. Requesting a term of imprisonment of fifteen years, the Government emphasized the national security threat Cheng's conduct posed to the United States, the sophistication of the scheme, the quantity and number of shipments of pressure transducers sent to Iran, and Cheng's knowledge of its illegality. Weymouth argued for a twenty-four-month sentence because other defendants in similar cases received short sentences and Cheng did not knowingly support Iran's nuclear weapons program, had no exposure to the United States or its laws, executed his scheme solely for personal gain, and did not need to be specifically deterred.

The Court asked about Cheng's Chinese mental health records. Weymouth did not submit translations of the records, but Cheng and an interpreter had translated them for him. Weymouth said that the records showed Cheng suffers from "mania" and argued that, while Cheng was competent to stand trial and criminally responsible, his mania and "racing thoughts" likely influenced his decision to participate in the scheme. Cheng then had a lengthy allocution. Among other things, he mentioned his two hospitalizations in China for "mania" and his diagnosis of Hepatitis B in 1999.

The Court sentenced Cheng to a term of imprisonment of nine years. Citing the factors under 18 U.S.C. § 3553(a), the Court emphasized the need for general deterrence, and Cheng's pecuniary motivation for the crime. The Court also recognized that his mental health problems might explain some of his statements (like "f--- the United States") but added it did not have much of a record on the issue of mental health. The Court also noted the sentence was consistent with United States v. Khazaee, a similar case from Connecticut raised by the Government in its sentencing memorandum. The Court issued a memorandum memorializing the reasons for its guidelines calculations and its sentence on February 1.

The First Circuit affirmed Cheng's nine-year sentence on March 1, 2017. United States v. Cheng, 849 F.3d 516, 517 (1st

Cir. 2017). The First Circuit determined that the Court did not err in its upward departure under Application Note 2 to U.S.S.G. § 2M5.1 or its balancing of the sentencing factors and that Cheng's sentence was not disproportionate to sentences in similar case. Id. at 518-21.

On April 10, 2017, Cheng filed a pro se motion to vacate his sentence under 28 U.S.C. § 2255. After securing counsel, Cheng filed an amended motion on April 5, 2018. In this motion, Cheng argues that Weymouth provided ineffective assistance of counsel in the following ways: 1) failure to translate and use his Chinese mental health records to support a mitigation argument or a departure under U.S.S.G. § 5H1.3 (mental and emotional conditions); 2) failure to call an expert on Iran to counter the testimony of David Albright; 3) failure to challenge the exercise of extraterritorial jurisdiction; 4) failure to challenge the Government's evidence that Cheng acted willfully; 5) failure to object to the use of Application Note 2 to U.S.S.G. § 2M5.1; 6) conceding that Cheng did not play a minor role in the conspiracy; and 7) a lack of trust in the attorney-client relationship.

On July 27, 2018, Cheng moved to amend his amended petition. In his motion, he withdraws his claim regarding a lack of trust with Weymouth. He also seeks to add the following ineffective assistance of counsel claims: 1) failure to move to dismiss based

on insufficiency of the indictment; 2) failure to distinguish United States v. Khazaee at sentencing; and 3) failure to use his medical records to argue for diminished capacity under U.S.S.G. § 5K2.13. Finally, he contends that his prosecution for extraterritorial conduct violated due process.

**DISCUSSION**

**I.  Motion to Amend**

**A.  Legal Standard**

A defendant must move to vacate his conviction or sentence within one year of "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). Where the defendant challenges his conviction or sentence before the court of appeals but does not to seek review in the Supreme Court, the "judgment of conviction becomes final when the time expires for filing a petition for certiorari." Ramos-Martínez v. United States, 638 F.3d 315, 320-21 (1st Cir. 2011) (quoting Clay v. United States, 537 U.S. 522, 525 (2003)). Parties have ninety days after entry of the judgment in the court of appeals to file a petition for certiorari. See Sup. Ct. R. 13.1; Ramos-Martínez, 638 F.3d at 321.

Federal Rule of Civil Procedure 15 governs amendments to § 2255 motions. United States v. Ciampi, 419 F.3d 20, 23 (1st Cir. 2005). Rule 15(c)(1)(B) permits an amendment to "relate back" to the date of the original pleading for purposes of

evaluating a statute of limitations if "the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out -- or attempted to be set out -- in the original pleading." For § 2255 motions, this provision "is to be strictly construed, in light of Congress' decision to expedite collateral attacks by placing stringent time restrictions on them." Ciampi, 419 F.3d at 23 (cleaned up). Thus, relation back is permitted for amendments to § 2255 motions only where the amended claims "arise from the 'same core facts'" as the timely claims and do "not depend upon events which are separate both in time and type from the events upon which the original claims depended." Id. at 24 (quoting Mayle v. Felix, 545 U.S. 644, 657 (2005)). For example, a defendant "does not satisfy the Rule 15 'relation back' standard merely by raising some type of ineffective assistance in the original petition, and then amending the petition to assert another ineffective assistance claim based upon an entirely distinct type of attorney misfeasance." Id.

**B.  Analysis**

The First Circuit entered judgment affirming Cheng's conviction on March 1, 2017. His conviction became final on May 30, 2017 when the ninety days to file a petition for certiorari expired. Because he did not move to amend his § 2255 petition until July 27, 2018, any new claims raised in his motion to amend

fall outside the one-year statute of limitations, unless they relate back to his April 5, 2018 motion. The Government seeks to exclude three ineffective assistance claims in Cheng's motion to amend as untimely: 1) failure to move to dismiss on the basis of an insufficient indictment; 2) failure to distinguish United States v. Khazaee at sentencing; and 3) failure to argue at sentencing for mitigation under U.S.S.G. § 5K2.13 (diminished capacity).

Cheng's claim that Weymouth was ineffective by failing to move to dismiss based on the insufficiency of the indictment is untimely. Nowhere in the April 2018 motion does he raise any challenge to the indictment's contents. He argues this claim arises from the same facts as his timely claim that Weymouth was ineffective in failing to argue he had insufficient notice of his criminal liability. This timely claim, however, concerns the distinct question of his contacts with the United States and understanding of the American legal system.

The second and third new claims are not time-barred. While Cheng did not specifically mention Khazaee in his April 2018 motion, he made arguments of ineffective assistance concerning calculation of the guidelines range, departures from that range, and his role in the offense that are similar to the arguments he contends Weymouth should have made to distinguish Khazaee. His claim that Weymouth was ineffective for not seeking a diminished

capacity departure at sentencing relates back to his timely
argument that Weymouth should have translated his mental health
records and used them more thoroughly at sentencing.

## II. Remaining § 2255 Claims

### A. Standard of Review

A federal criminal defendant "may petition for post-
conviction relief under 28 U.S.C. § 2255(a) if, inter alia, the
individual's sentence 'was imposed in violation of the
Constitution or laws of the United States' or 'is otherwise
subject to collateral attack.'" Lassend v. United States, 898
F.3d 115, 122 (1st Cir. 2018) (quoting 28 U.S.C. § 2255(a)).
Claims of ineffective assistance of counsel are cognizable on a
§ 2255 motion. Rivera-Rivera v. United States, 844 F.3d 367, 372
(1st Cir. 2016). The defendant bears the burden of establishing
his entitlement to relief. Lassend, 898 F.3d at 122.

"Evidentiary hearings on § 2255 petitions are the
exception, not the norm," and the defendant bears "a heavy
burden . . . to demonstrate that an evidentiary hearing is
warranted." Moreno-Morales v. United States, 334 F.3d 140, 145
(1st Cir. 2003). A court need not hold an evidentiary hearing if
the petition "(1) is inadequate on its face, or (2) although
facially adequate, is conclusively refuted as to the alleged
facts by the files and records of the case." Id. (quoting United
States v. DiCarlo, 575 F.2d 952, 954 (1st Cir. 1978)). Because

the record in this case demonstrates that all of Cheng's claims lack merit, the Court declines to hold an evidentiary hearing.

## B.    Inadequate Nexus to the United States

Cheng argues his prosecution was invalid because his conduct lacked a connection to the United States. Although he stylizes his argument as one about subject matter and personal jurisdiction, his claim appears to be a due process challenge to his prosecution on the basis of an inadequate nexus between his conduct and the United States. He notes he is a foreign citizen who never entered or bought anything directly from the United States, his involvement with the transducers occurred after they left the country, and he did not willfully cause any harmful effects in the United States. He also contends the statutes under which he was convicted do not apply extraterritorially and he had insufficient notice of his potential criminal liability.

Cheng's argument that his prosecution violated due process because he lacked a "sufficient nexus" to the United States is meritless. The First Circuit has rejected the Ninth Circuit's holding in United States v. Davis, 905 F.2d 245 (9th Cir. 1990), that due process requires a "sufficient nexus" between the criminal conduct and the United States. See United States v. Cardales, 168 F.3d 548, 552-53 (1st Cir. 1999). Instead, application of a criminal statute to extraterritorial conduct satisfies due process as long as it is not "arbitrary or

14

fundamentally unfair." Id. at 553. Courts look to international law to determine if due process is satisfied. Id. "Under the 'protective principle' of international law, a nation is permitted 'to assert jurisdiction over a person whose conduct outside the nation's territory threatens the nation's security.'" Id. (quoting United States v. Robinson, 843 F.2d 1, 3 (1st Cir. 1988)). As the Court determined at sentencing, exporting pressure transducers that can be used to develop nuclear weapons to Iran threatens the security of the United States. This prosecution fits within the protective principle and, because it comports with international law, does not violate due process.

In addition to satisfying due process, Cheng's convictions represent permissible domestic applications of the statutes involved and therefore do not raise extraterritoriality concerns. Under the International Emergency Economic Powers Act ("IEEPA"), the president may "prohibit . . . exportation of . . . any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). The IEEPA applies when either the exporter or the property at issue is subject to the jurisdiction of the United States. See McKeeve, 131 F.3d at 10-11.

Cheng exported pressure transducers that were subject to the jurisdiction of the United States because they came from

15

Massachusetts. See id. at 11. In Cheng's case, the focus of the conduct the IEEPA regulates is the exporting of property out of the United States to Iran. See WesternGeco LLC v. ION Geophysical Corp., 138 S. Ct. 2129, 2137 (2018) ("The focus of a statute is the object of its solicitude, which can include the conduct it seeks to regulate . . . ." (cleaned up)). Because "the conduct relevant to the statute's focus occurred in the United States," Cheng's substantive convictions for violating the IEEPA constitute "a permissible domestic application" even though other conduct occurred abroad. RJR Nabisco, Inc. v. Euro. Cmty., 136 S. Ct. 2090, 2101 (2016).

Cheng's argument fares no better for his conspiracy convictions. In McKeeve, the First Circuit rejected the argument that an individual can conspire to violate the IEEPA only if he sets foot in the United States during the conspiracy. 131 F.3d at 10-11. Because the IEEPA applies to property subject to the jurisdiction of the United States, an individual outside the United States conspires to violate the IEEPA as long as he "knew the locus" of the goods and "knew that U.S. law prohibit[s] its export to" the country in question. Id. at 11. Prosecution for such conspiracy does not involve an extraterritorial application of the statute. See id. at 10-11. Cheng's conviction falls neatly within the holding of McKeeve because he admitted at the Rule 11 hearing that he knew 1) the pressure transducers came from the

United States and 2) export of the transducers to Iran violated U.S. law. It is therefore irrelevant that Cheng himself did not export goods from the United States but instead coordinated his shipments through MKS Shanghai. To the extent an overt act with the United States is required, MKS Shanghai sent an order for the pressure transducers to MKS in Massachusetts. See id. at 11.

Although McKeeve involved only conspiracy to violate the IEEPA, the same logic renders Cheng's conviction for conspiracy to violate 18 U.S.C. § 554(a) valid. That statute imposes criminal liability on "[w]hoever fraudulently or knowingly exports or sends from the United States . . . any merchandise, article, or object contrary to any law or regulation of the United States." 18 U.S.C. § 554(a). Cheng entered into a conspiracy with the intent to export goods he knew came from the United States with the understanding that doing so was a violation of U.S. law, and the ordering of the pressure transducers in Massachusetts constituted an overt act in furtherance of the conspiracy. See McKeeve, 131 F.3d at 11 (explaining "that a conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction" (quoting United States v. Inco Bank & Tr. Corp., 845 F.2d 919, 920 n.4 (11th Cir. 1988) (per curiam))).

Finally, Cheng contends his prosecution violated due process because he had inadequate notice of his potential criminal liability. When his argument is read most charitably, he appears to claim he could not have reasonably anticipated being prosecuted in the United States. See, e.g., <u>United States v. Ali</u>, 718 F.3d 929, 944 (D.C. Cir. 2013). The record belies this notion, as he admitted at the Rule 11 hearing that he knew his scheme violated U.S. law. Cheng's post hoc claim to the contrary holds little weight. See <u>United States v. Santiago Miranda</u>, 654 F.3d 130, 138 (1st Cir. 2011). In fact, in multiple online chats he exchanged with Jamili during the conspiracy, he demonstrated his understanding of the illegality of his conduct. His knowledge that his conduct violated U.S. law put him on sufficient notice of his potential criminal liability to satisfy due process.

### C.    Ineffective Assistance of Counsel

#### 1.    *Legal Standard*

"To prevail on an ineffective assistance of counsel claim," a criminal defendant "must show both that his 'counsel's representation fell below an objective standard of reasonableness' (the performance prong), and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' (the prejudice prong)." <u>Rivera v. Thompson</u>, 879 F.3d 7, 12 (1st Cir. 2018) (quoting <u>Strickland v. Washington</u>, 466 U.S. 668, 688,

694 (1984)). "[F]ailure to satisfy one prong . . . obviates the
need for a court to consider the remaining prong." Tevlin v.
Spencer, 621 F.3d 59, 66 (1st Cir. 2010). A court may consider
either prong first in the interest of efficiency. Ortiz-
Graulau v. United States, 756 F.3d 12, 17 (1st Cir. 2014).

Under the performance prong, the defendant must show that,
"given the facts known at the time, counsel's choice was so
patently unreasonable that no competent attorney would have made
it." Rivera, 879 F.3d at 12 (quoting Knight v. Spencer, 447 F.3d
6, 15 (1st Cir. 2006)). This analysis covers all of the
circumstances surrounding the challenged conduct or decision and
requires "evaluating the attorney's conduct 'from counsel's
perspective at the time' and in light of 'prevailing professional
norms.'" Id. (quoting Strickland, 466 U.S. at 688-89). Review of
counsel's performance is "highly deferential" and subject to "a
strong presumption that [it] falls within the wide range of
reasonable professional assistance." Strickland, 466 U.S. at 689.
A defendant faces an especially high burden in challenging
counsel's tactical decisions. See Lucien v. Spencer, 871 F.3d
117, 129 (1st Cir. 2017).

For the prejudice prong, the defendant cannot show simply
"that the errors had 'some conceivable effect on the outcome,'"
but he does not have to "prove that the errors were more likely
than not to have affected the verdict." Rivera, 879 F.3d at 12

(quoting González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001)). A reasonable probability is instead one that undermines confidence in the outcome. Id.

When the defendant alleges that ineffective assistance induced him to plead guilty, the prejudice analysis asks whether "there is a reasonable probability that, but for counsel's errors, [he] would not have pleaded guilty and would have insisted on going to trial." United States v. Luis Rivera-Cruz, 878 F.3d 404, 410 (1st Cir. 2017) (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)). The probability that the defendant would not have pleaded guilty "must be substantial, not just conceivable." Williams v. United States, 858 F.3d 708, 715 (1st Cir. 2017) (quoting Rivera-Rivera v. United States, 827 F.3d 184, 187 (1st Cir. 2016)). In undertaking this analysis, courts do not rely solely on "post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." Lee v. United States, 137 S. Ct. 1958, 1967 (2017). Rather, they "look to contemporaneous evidence to substantiate [his] expressed preferences." Id. When the defendant's "decision about going to trial turns on his prospects of success and those are affected by the attorney's error," he must also show he "would have been better off going to trial." Id. at 1965.

2.   *Ineffective Assistance of Counsel Pre-Guilty Plea*

Cheng argues he received ineffective assistance of counsel in pleading guilty because Weymouth failed to advise him of his right to move to dismiss the indictment for lack of subject matter and personal jurisdiction, a violation of due process because of his inadequate nexus to the United States, and inadequate notice of his criminal liability. Cheng fails to show he would not have pleaded guilty had Weymouth advised him of these arguments. It is unlikely Cheng would have decided to go to trial had Weymouth explained these weak arguments to him. See id. Indeed, Cheng admits in an affidavit he would have pleaded guilty anyway because he feared facing an American jury.

3.   *Ineffective Assistance of Counsel at Sentencing*

Cheng raises a slew of ineffective assistance of counsel claims concerning Weymouth's representation at sentencing.

a.   Translation and Use of Mental Health Records

Cheng contends Weymouth was ineffective in failing to have his Chinese mental health records fully translated for sentencing. Weymouth should have used the records, Cheng argues, to seek a downward departure under U.S.S.G. § 5H1.3 (mental and emotional conditions) or § 5K2.13 (diminished capacity). But even if Weymouth was ineffective in not doing so, Cheng does not show prejudice because the records do not change the general picture

of his mental health available to the Court at sentencing or support a departure on either ground.

As noted above, the PSR described the two hospitalizations reflected in the Chinese records. In fact, the PSR provided more details than the records by describing Cheng's repeated suicidal thoughts in 2002, 2003, and 2012 and the triggers for his hospitalizations. Relying on the PSR, Weymouth argued at sentencing that Cheng's mental health was a mitigating factor favoring a variance under 18 U.S.C. § 3553(a) to a below guideline sentence. The Court acknowledged this mental health history, stating that Cheng's mental health problems involving mania/bipolar disease counseled against taking his extreme anti-American statements too literally. Cheng emphasizes that the PSR and Weymouth called his mental health condition "mania" instead of "bipolar disorder," the term used in his Chinese records. While "mania" and "bipolar disorder" are different psychiatric disorders, he does not explain why the distinction matters for sentencing.

Cheng's Chinese records (which are consistent with the PSR) describe two bipolar episodes with significant symptoms in 1999 and 2012 for which he was hospitalized. See Dkt. No. 152-1 at 7 (describing his "rapid speech," "rapid stream of thoughts," "heightened emotion," and "grandiose delusion" in 1999); id. at 18 (describing him as having "no sleep at night, mania, [and]

22

chattiness," being "emotional" and "physically aggressive," and claiming to know the U.S. president and possess "super human ability" in 2012). However, the records also state he was "mentally clear" and "able to make decisions" during his first hospitalization. Id. at 7. His condition improved during both hospitalizations, indicating that treatment was likely effective for him. Cheng has received treatment from BOP while in prison, and his BOP records describe his most recent bipolar episode as "mild." Dkt. No. 166-1 at 1.

Nothing in the Chinese records demonstrates that Cheng's bipolar disorder contributed substantially to his offense. See United States v. Stinefast, 724 F.3d 925, 931 (7th Cir. 2013) (noting that a court cannot assume a link between the defendant's reduced mental capacity and the criminal conduct). It is unlikely that someone with significant diminished capacity could engage in such a complex scheme to evade U.S. sanctions, although his bipolar disorder might explain his outrageous statements. While the records indicate that Cheng was hospitalized in 2012, he has provided no report from a psychiatrist or other mental health professional about the time period of the admitted conspiracy, which spanned from 2009 to 2011, or records about his mental health during this period. He also has not presented any information about his mental health for the six years prior to the beginning of the conspiracy. He therefore cannot show a

reasonable probability that, had Weymouth conducted such an investigation, his sentence would have been different.

Cheng mentions in passing that Weymouth could have used his Chinese records to argue that he was incompetent to stand trial. Although he expresses some confusion about the rights he gave up by pleading guilty in a post-conviction affidavit, there is no evidence he did not "understand the nature of the proceedings against him" or was unable "to cooperate with counsel in his defense." Robidoux v. O'Brien, 643 F.3d 334, 339 (1st Cir. 2011).

### b.    Expert on Iran's Nuclear Program

Cheng argues Weymouth was ineffective in failing to produce an expert to counter the testimony of David Albright on the issue of whether Cheng's scheme created an extreme national security risk to the United States. Cheng has submitted an affidavit from Dr. Aaron Arnold, a researcher at Harvard University and professor at Curry College, who contends that many documents publicly available at the time of sentencing raise questions about whether Iran was pursuing nuclear weapons when Cheng was exporting pressure transducers to the country. If presented with the conflicting evidence about Iran's nuclear weapons program, Cheng contends, the Court would not have upwardly departed six levels under Application Note 2 to U.S.S.G. § 2M5.1.

U.S.S.G. § 2M5.1(a)(1) imposes a base offense level of 26 if "national security controls or controls relating to the

proliferation of nuclear, biological, or chemical weapons or materials were evaded." The parties agreed at sentencing this was the appropriate starting point for his guidelines range, and Cheng rightfully does not challenge this decision. See McKeeve, 131 F.3d at 14 (holding that, where an embargo "is intended as a national security control," § 2M5.1(a)(1) "applies to any offense that involves a shipment (or proposed shipment) that offends the embargo, whether or not the goods shipped actually are intended for some innocent use").

To determine a sentence under § 2M5.1, Application Note 2 instruct courts to consider "the degree to which the violation threatened a security interest of the United States, the volume of commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences." U.S.S.G. § 2M5.1 cmt. n.2. Courts may upwardly depart from the base offense level "[w]here such factors are present in an extreme form." Id. Here, the Court found all four factors present to "an extreme degree" and imposed an upward departure of six levels. Dkt. No. 90 at 16-17. As relevant here, the Court determined that "Cheng's offense threatened a security interest of the United States because he exported pressure transducers to Eyvaz, knowing that they would

be used in Kalaye's uranium enrichment process to support Iran's development of a nuclear weapons program."[2] Id.

Cheng plausibly argues that Weymouth provided ineffective assistance by failing to at least consult with, if not hire, any expert on Iran's nuclear program to counter Albright's testimony on a central issue at sentencing. See Dugas v. Coplan, 428 F.3d 317, 329-30 (1st Cir. 2005) (finding an attorney's failure to investigate the cause of the alleged arson and hire an arson expert constitutionally deficient where challenging the state's arson case was "critical" to the defense, the arson evidence was the "cornerstone" of the state's case, and the attorney "lacked any knowledge" of the subject). Even if Weymouth's representation was ineffective, however, Cheng fails to demonstrate a reasonable probability that hiring an expert would have changed the result of sentencing because the information his expert would have provided would still have supported an upward departure.

Albright testified that Iran used Kalaye, which Cheng knew was the end user of the pressure transducers, to hide its efforts to produce weapons-grade uranium and that Kalaye was designated

---

[2]    Cheng claims Weymouth was ineffective for failing to formally object to this upward departure in his April 2018 motion but appears to drop this argument in his motion to amend. In any event, he cannot show prejudice: Weymouth argued against the departure at sentencing, and the First Circuit reviewed his sentence, including this departure, under the abuse of discretion standard as if he had preserved his objection. See Cheng, 849 F.3d at 518 & n.1.

by the United States as a proliferator of weapons of mass destruction in 2007. He noted that the pressure transducers Cheng sent to Iran were vital for operation of the centrifuges used in its nuclear program. He explained that Iran's nuclear weapons program continued until at least the discovery of the Fordow plant in 2009 but that, even if Iran stopped enriching weapons-grade uranium at that time, it had the capability to restart the program. Significantly, some of the shipments at issue in this case were made before Fordow was uncovered in 2009.

In his affidavit, Dr. Arnold refers to public documents that he states "directly contradict the assertion that Iran was pursuing a nuclear weapons program during the period of time that Mr. Cheng shipped export-controlled items to Iran." Dkt. No. 142 at 6-7. Instead, he claims Iran stopped its nuclear weapons program in 2003. He concludes that, "while it is true that the MKS pressure transducers that Mr. Cheng shipped to Iran were likely used by Iran to enrich uranium, it may not have been the case, and likely was not the case, that the parts were used in a nuclear weapons program." Id. at 8.

Even if Iran stopped its nuclear weapons program in 2003, before Cheng began supplying pressure transducers, his conduct would still have "threatened a security interest of the United States" to an "extreme" degree. U.S.S.G. § 2M5.1 cmt. n.2. Cheng provided the Iranian government with pressure transducers that it

could use to enrich uranium. While Iran may have used them for civilian nuclear enrichment, it could have restarted its weapons-grade enrichment at any point. Providing pressure transducers to Iran knowing they would be used to enrich uranium of any sort is an extreme threat to American national security. Furthermore, as Albright testified, Cheng actively supplied Iran with pressure transducers while the United States was beginning to negotiate with Iran to eliminate some of its centrifuges. Cheng's conduct therefore directly undermined American efforts to reduce the threat posed by Iran. Because the information Cheng wishes Weymouth had provided the Court would have still showed that Cheng's conduct posed an extreme national security threat to the United States, he fails to demonstrate a reasonable probability that the Court would not have imposed an upward departure under Application Note 2 to U.S.S.G. § 2M5.1 had Weymouth consulted or called an expert on Iran's nuclear program.

### c.  Evidence of "Willful" Mens Rea

Cheng claims Weymouth was ineffective for not recognizing the Government only had weak evidence he violated American export controls "willfully" as required under the IEEPA. 50 U.S.C. § 1705(c). He explains that he lied about the destination of the shipments because he thought MKS did not want to sell to Iran for business reasons. Weymouth should have emphasized the weakness of the Government's mens rea evidence at sentencing to show his

scheme was not sophisticated, Cheng contends, and he may not have even pleaded guilty had Weymouth informed him of his mens rea defense.

In United States v. Murphy, the First Circuit held that the willfulness element of the Arms Export Control Act requires only that the defendant knew he was violating the law, not that he knew the details of the law he was violating. 852 F.2d 1, 6-7 (1st Cir. 1988). The First Circuit has not defined willfulness under the IEEPA, but other circuit courts have defined the term similarly. See, e.g., United States v. Mousavi, 604 F.3d 1084, 1094 (9th Cir. 2010); United States v. Elashyi, 554 F.3d 480, 505 (5th Cir. 2008); United States v. Homa Int'l Trading Corp., 387 F.3d 144, 146-47 (2d Cir. 2004). Accordingly, the Court rejects Cheng's claim that Weymouth was ineffective for not arguing that the IEEPA's willfulness element requires that a defendant know he needs a license to export the specific goods in question, which he takes from dicta in a Ninth Circuit opinion discussing whether the IEEPA is void for vagueness. See United States v. Guo, 634 F.3d 1119, 1122-23 (9th Cir. 2011).

Given this willfulness standard, Cheng cannot show prejudice even if Weymouth provided ineffective assistance of counsel in failing to recognize this defense. At the Rule 11 hearing and again at sentencing, Cheng acknowledged in response to specific questions from the Court that he knew his conduct was illegal.

These admissions undermine his attempt in his post-sentencing affidavit to suggest he did not understand the illegality of his conduct. See United States v. Gates, 709 F.3d 58, 69 (1st Cir. 2013) ("A defendant is normally bound by the representations that he himself makes in open court at the time of his plea."). The Government also had substantial, albeit circumstantial, evidence that Cheng knew his conduct violated the law. He removed serial numbers from the transducers, for example, and told Jamili it would be a problem if someone found out about his scheme. See United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994) (noting that it is "neither legally problematic nor even controversial" to rely on circumstantial evidence alone to prove knowledge). Cheng's admission in an affidavit that he still would have pleaded guilty had Weymouth informed him of a possible mens rea defense eviscerates any argument that he suffered ineffective assistance in pleading guilty.

### d. Minor Player in the Conspiracy

Cheng next argues Weymouth was ineffective for conceding at sentencing that he was not entitled to a minor-role adjustment. See U.S.S.G. § 3B1.2(b) (decreasing the total offense level by two points if "the defendant was a minor participant in any criminal activity"). To qualify for a minor-role adjustment, the defendant's participation in the offense must make "him substantially less culpable than the average participant in the

30

criminal activity." Id. cmt. n.3(A); accord United States v.
Arias-Mercedes, 901 F.3d 1, 5-6 (1st Cir. 2018). Determining
whether to apply a minor-role adjustment is fact-dependent.
U.S.S.G. § 3B1.2 cmt. n.3(C). Among other factors, courts
consider:

> (i) the degree to which the defendant understood the
> scope and structure of the criminal activity; (ii) the
> degree to which the defendant participated in planning
> or organizing the criminal activity; (iii) the degree
> to which the defendant exercised decision-making
> authority or influenced the exercise of decision-
> making authority; (iv) the nature and extent of the
> defendant's participation in the commission of the
> criminal activity, including the acts the defendant
> performed and the responsibility and discretion the
> defendant had in performing those acts; (v) the degree
> to which the defendant stood to benefit from the
> criminal activity.

Id. The defendant bears the burden of showing he is entitled to a
minor-role adjustment. United States v. García-Ortiz, 657 F.3d
25, 29 (1st Cir. 2011).

Cheng fails to show prejudice from the allegedly ineffective
representation because his argument for a minor-role adjustment
is without merit. Although MKS Shanghai employees were involved
in illegal exporting before Cheng contacted them, he and Jamili
hatched the scheme to export pressure transducers to Iran. As the
middleman receiving transducers from the United States and
sending them to Iran, Cheng was an integral part of the scheme to
evade U.S. sanctions. His involvement in the scheme covered the
most of the period of the charged conspiracy, and during that

period, he relayed 1,185 transducers to Iran and exchanged over 39,000 chat messages with Jamili. He decided to remove the transducers' serial numbers to reduce suspicion. He was fully aware he was providing the transducers to a company involved in Iran's nuclear program. He benefited financially from the scheme. Accordingly, Cheng was "present for the planning of the scheme and deeply involved in its execution" and was thus not entitled to a minor-role adjustment. United States v. Meléndez-Rivera, 782 F.3d 26, 29 (1st Cir. 2015). Because Cheng fails to show his minor-role argument had a reasonable probability of succeeding, this ineffective assistance of counsel claim fails.

e.  Distinguishing Khazaee

Finally, Cheng argues Weymouth was ineffective in failing to distinguish his case from the Khazaee case the Government cited in its sentencing memorandum. In contrast to the U.S. citizen defendant who shuttled top secret information about American fighter jets to Iran in Khazaee, Cheng claims he was a stranger to the United States and its laws, had mental health issues that prevented him from understanding the nature of his actions, and acted only in willful blindness to the illegality of his conduct.

Even if Weymouth was ineffective in failing to expressly distinguish Khazaee, Cheng cannot show a reasonable probability he would have received a different sentence had Weymouth done so. Weymouth did argue for a lower sentence for the same reasons

Cheng contends his case differed from Khazaee. See, e.g., Dkt. No. 104 at 136:4-8 ("I'm still asking you to . . . drop down below the Guidelines, Judge, based on . . . the fact that this young man is from China, never been to the United States before . . . ."); id. at 163:15-18 ("Mr. Cheng . . . [is] naïve about the realities of the international world."); id. at 163:24-164:1 (noting that Cheng's conduct "goes quite well with this mania that he has"); id. at 169:14-170:6 (discussing how Cheng's mania "fed into his choice of that particular occupation"). Cheng provides no reason to believe his sentence would be different had Weymouth specifically mentioned the Khazaee case.

## ORDER

For the foregoing reasons, Cheng's motion to amend (Docket No. 185) is **ALLOWED IN PART** and **DENIED IN PART**, and Cheng's motion to vacate his sentence (Docket No. 146) is **DENIED**. SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
Chief United States District Judge